HARRISON and Others *v.* LOCKHART.

LIQUOR TRAFFIC—RESTRAINT OF TRADE.—Public policy in this State, as evinced by the legislative enactments, from the earliest times to the present, has always been to restrain the traffic in intoxicating liquors, and hence a contract in restraint of that traffic, if made upon a sufficient consideration, will be enforced, though the restraint be territorially co-extensive with the State.

APPEAL from the *Morgan* Common Pleas.

RAY, J.—The appellants brought this action upon a bond, the condition of which was that the appellee would not engage thereafter, at any time, nor in any manner whatever, in the business of retailing or selling intoxicating liquors as a beverage, or otherwise, within the original plat of the town of *Martinsville*, *Morgan* county, or within one mile thereof, by himself or through the agency of any other person whomsoever. The consideration of the bond was the payment of $40. The penalty was in the sum of $500. The breach of the bond assigned is, that the appellee has engaged in the sale of intoxicating liquors as a beverage, within the limits of the original town plat of *Martinsville*. A plea in abatement was filed, but was not verified, and the court committed no error in sustaining a motion to strike out the answer. *Bradley* v. *The Bank*, 20 Ind. 528. A demurrer was sustained to the complaint. This is the error assigned.

The policy of the law is to permit parties capable of contracting to make their own agreements; and when founded upon a good or valuable consideration they will be enforced, or damages given for their violation. Certain classes of contracts form an exception to this rule, and are declared exceptions to this policy of the law. Among these classes, are what are called contracts in restraint of trade. There have been numerous decisions in which this exception to the general policy has been announced and vindicated.

Harrison and Others *v.* Lockhart.

Perhaps this has not been done more satisfactorily by any judge than by SELDEN, Justice, in the case of *Lawrence* v. *Kidder*, 10 Barb. S. C. R. 641. He states the law and the reason for the law thus:

"The validity of the contract does not, depend in the slightest degree upon the question whether it is beneficial or otherwise to the party bound. The interests of the public were alone considered in the adoption of the rule. These interests are divisible into two branches, and it will tend to elucidate the subject to make the distinction. The welfare of a State is advanced by the increase of its productive industry. It is important, therefore, that each of its citizens should be free to employ himself in that department of labor in which his personal efforts will be likely to add most to the aggregate productions of the country. This is the first and leading reason for the rule in question. But there is another. The convenience of the public requires that all the various trades and employments of society should be pursued each in its due proportion, a result with which the exclusion of any individual from his accustomed pursuit has a tendency to interfere. The two reasons for the invalidity of contracts in restraint of trade are entirely distinct from each other. One relating to the wealth and profit, and the other to the convenience of the nation."

Certain exceptions are recognized as existing, and in speaking of one exception to the rule, this eminent jurist uses this language: "If we take a general view of the subject, and of all the authorities bearing upon it, we shall see that the exceptions we are considering rest exclusively upon the principle that whenever the reason of the rule does not exist, the rule itself ceases."

In the opinion of PARKER, Justice, in *Mitchell* v. *Reynolds*, 1 P. Williams 181, it is stated, "That in all restraints of trade, where nothing more appears, the law presumes them bad; *but if the circumstances are set forth*, that presumption is excluded, and the court is to judge of these circumstances

and determine accordingly, and if, upon them, it appears to be a just and honest contract, it ought to be maintained."

It is very plain, that if the occupation which is prohibited by the contract now under consideration is within the protective policy of the law, the contract itself cannot be sustained, for its terms do not come within the exceptions which have been declared to the rule. It is within the exceptions so far as the restriction extends territorially; but the rule is, that to sustain such contracts, the restriction must be imposed for the benefit of some one who will himself engage in the same general employment, so that the public may not suffer inconvenience, nor be deprived of the good resulting from the continued carrying on of the pursuit. *Lawrence* v. *Kidder, supra.*

It remains then to determine whether this pursuit is within the protection of the law. Upon this question we are not aided by decisions, and must determine, in the language of SELDEN, Justice, whether it is within the reason of the rule. This can be determined alone by the course of legislative action, and from that we must learn the policy of the law in regard to the protection of this traffic.

Laws were passed in the reign of *Edward* the Third, *Henry* the Third, and *Henry* the Eighth, prohibitory in their character of the sale of liquors. In the time of *Henry* the Third an act was passed disqualifying persons engaged in such employments from holding any office of a judicial or executive character. Early in the present century, in our own country, movements were commenced among the people which, to a greater or less extent, have from time to time influenced legislative action, and at present the traffic in intoxicating liquor as a beverage is absolutely prohibited in some of the States of the Union.

As early as the year 1807, the General Assembly of *Indiana* Territory passed an act declaring that, "For preventing disorders, and the mischiefs that may happen by the multiplicity of public houses of entertainment, no person or persons shall, in future, keep any public inn or tavern, ale

house or dram shop, or public house of entertainment, in any county, town or place within this Territory, unless such person, or persons, shall first obtain permission, or license, from the Court of Common Pleas, which shall continue for one year and no longer." It was also provided that "no person licensed as aforesaid, shall knowingly suffer any disorder, as drunkenness, or unlawful games whatever, in such, his, her or their houses, under the penalty of $5 for the first offense, and for the second offense to be suppressed by the judges of the several courts." A bond was required to be given to the Governor of the Territory, that the person so receiving license would always be of good behavior, observe all laws, ordinances, &c.

By the sixth section of the act it was declared, that "No person or persons, other than such as are, or shall be, qualified so to do by this law, shall presume, under any color or pretense, to sell, barter with or deliver any wine, rum, brandy, or other spirits, or strong water, beer, cider, or any mixed or strong liquors, to be used within his, her or their houses, yards or sheds, or to be with his, her or their knowledge, privity or consent used or drank in any shelter, places or woods near or adjacent to them, by companies of servants, slaves or others, nor to retail or sell to any person or persons any rum, brandy or other spirits, or strong water, by less quantity or measure than one quart, nor any wine by less quantity or measure than one quart, nor any beer, ale or cider by any quantity less than two gallons, the same liquors being respectively delivered to one person and at one time, without any collusion or fraud contrary to the true intent and meaning of this law. Any person offending herein shall pay a fine of $12, on conviction by indictment, to the use of the proper county." Laws of Indiana Territory, 1807, p. 87.

An act was passed by the State legislature in the year 1818, prohibiting the sale in less quantity than a quart at a time, or at retail, to be drank about the premises, of any spirituous or strong liquors, without obtaining a license

therefor. A license was to be granted, on application, by the board of county commissioners, "provided the person so applying shall produce the certificate of twelve respectable householders that such person is of good moral character, and that it would be for the benefit and convenience of travelers for such person to be licensed as aforesaid; provided, also, that such person shall first enter into bond, with sufficient sureties, to be approved by the commissioners, in the sum of $500, payable to the county treasurer, that he or she will not permit any gambling, rioting or disorderly conduct in his or her house." No spirituous liquor could be sold to minors, apprentices or servants, without the consent of the parent or master. A sale upon credit to an amount exceeding $5 in value could not be collected. Laws of 1818, p. 296.

In the law passed in the year 1825, the certificate of good moral character required of the applicant for license was to be signed by twenty-four respectable inhabitants of the town or village, freeholders, and was to contain the additional averment, that the granting of the license "would be conducive to the public good."

This same spirit continued to pervade our legislation, and in 1853 an act was passed requiring the consent of a majority of the legal voters of the township, before a license to sell intoxicating liquor could be issued. A bond was also required, with sureties, and upon such bond suit could be instituted by the wife, child, parent, guardian, employer or other person who should be injured in person, property or means of support by any intoxicated person, when the principal in the bond had produced such intoxication. All contracts entered into by any person while in a state of intoxication were declared voidable.

Laws have also been passed prohibiting the sale or giving away of intoxicating liquors within two miles of any collection of any inhabitants of this State, met together for worship.

In the year 1855 a law was passed prohibiting the sale of

such liquors as a beverage in this State. In the language of PERKINS, Justice, in *Beebe* v. *The State*, 6 Ind. 520, "The legislature enacted the law in question upon the assumption that the manufacture and sale of beer, &c., were necessarily destructive to community."

The acts of 1853 and of 1855 were held unconstitutional by this court, but are nevertheless to be considered as indicating the policy of the law-making power in regard to the traffic in intoxicating liquor.

In 1859 an act was passed by the legislature requiring a license for the sale of intoxicating liquor, which was only to be issued to the applicant upon his showing to the satisfaction of the board of commissioners of the county, that he was a man of good moral character and fit to be trusted with said license, and upon his giving bond. This act prohibited the sale to minors and to persons in a state of intoxication, or to any person who was in the habit of being intoxicated.

It will be seen, from this rapid view, that it has not been the policy, either in *England* or in this country, to encourage the traffic in intoxicating liquor; but that, in this country, the whole action of the legislative power has been uniformly to limit, restrict, or absolutely prohibit the traffic. With us, from the time almost of our earliest territorial existence to the present moment, that policy has been pursued, and, in the opinion of former judges of this court, the utmost verge of legislative power was passed in the vain attempt to prohibit the sale.

In the light of such a record, and with the legislative enactment still standing unrepealed, and its power unquestioned in this court, would it become us to declare that it was the settled policy of this State to encourage the traffic in intoxicating liquor, and to protect it, that it might add to the wealth of the State, or serve the convenience of the public? We are not placed here by the people to dictate a policy to the legislature, but to declare and give effect to the policy they may adopt, if that policy do not clearly contravene the provisions of the constitution.

The effect of the entire legislation upon the liquor traffic has been, not to encourage persons to embark in the business, but to hedge it about with restrictions and qualifications, and overshadow it with pains and penalties. The whole course of legislation on this subject prevents any presumption being indulged that this traffic, like other employments, adds to the wealth of the nation, or to the convenience of the public. The act of 1818, *supra,* clearly indicates that the traffic was regarded as not contributing to the good of the public, for by the terms of that law the business was prohibited, and no license could be granted, unless the applicant produced "the certificate 'of twelve respectable householders that such person was of good moral character, and that it would be for *the benefit and convenience of travelers* for such person to be licensed."

The State, at that early period, was thinly settled, and when the interest of the public was considered, the travelers and the local inhabitants stood relatively somewhat differently in making up that public, from the proportion of class to class existing at a later date, when the law, as then amended, required the certificate to be signed by twenty-four respectable freeholders, inhabitants of the town or village, and to contain the statement that the granting of the license in each instance "would be *conducive to the public good.*" Acts ·of 1825. The presumption is thus declared, in almost express terms, to be that the traffic is injurious to the public interests, and hence the reason of the rule protecting other employments does not apply to this one, and therefore it cannot be said to be within the rule. The formal declaration that the granting of the permission to engage in the employment will, in each instance, be conducive to the public good, is no longer required, but. the continued restrictive legislation on the subject certainly forbids us to conclude that there has been so radical a change in the policy of the law-givers as to create a presumption in favor of the trade, and bring it within the rule prohibiting, for the sake of the

public good, any man to contract not to engage in that employment.

In our judgment, it is not in contravention of the policy of legislation in this State, for an inhabitant to bind himself, upon a sufficient consideration, not to engage in the traffic in intoxicating liquors, and the territory embraced in the contract may be co-extensive with the legislative jurisdiction.

The action of the court upon the demurrer to the complaint was therefore erroneous.

The judgment is reversed, at the costs of the appellee, and the cause remanded, with directions to the court below to overrule the demurrer to the complaint, and grant leave to answer.

*W. R. Harrison, & W. S. Shirley,* for appellants.

*C. F. McNutt, A. Ennis* and *O. B. Hord,* for appellee.