# SOPHER *v.* THE STATE.

[No. 21,049. Filed June 25, 1907; Rehearing denied October 18, 1907.]

1. STATUTES. — *Reënactment.* — *Construction.* — Where a statute, which has been judicially construed, is reënacted, the construction given will be considered as a part of the legislative intent in such reënactment. p. 181.

2. SAME.—*Common Law.*—*Acts of Parliament.*—The common law, with the acts of parliament in aid thereof, prior to the fourth year of the reign of James I, is in force in Indiana, except where inapplicable or where inconsistent with constitutional or statutory provisions. p. 182.

3. CRIMINAL LAW.—*Crimes.*—All crimes in Indiana are statutory. p. 182.

4. NUISANCE.—*Public.*—A public nuisance is one that always arises out of the violation of a public right, and ordinarily results in special injury to one person the same as to another. p. 182.

5. SAME.—*Public.*—*Legitimating.*—Where the state legitimates an act, otherwise unlawful, such act cannot be considered as constituting a public nuisance. p. 183.

6. SAME.—*Saloons.*—*Intoxicating Liquors.*—An ordinary saloon does not, at the common law, constitute a public nuisance, but such place when kept in an unlawful manner may become such. p. 183.

7. CONSTITUTIONAL LAW.—*Intoxicating Liquors.*—*Licensing Sale of.*—*Statutes.*—The legislature has the constitutional right, as a restrictive measure, to license the traffic in intoxicating liquors for beverage purposes. p. 186.

8. INTOXICATING LIQUORS.—*Sales.*—*Right to Engage in.*—*Curtailment.*—The right to engage in the sale of liquors at retail arises solely from the common law, and such right is subject to any restriction the legislature sees fit to impose under its exercise of the police power. p. 194.

9. COURTS.—*Duties.*—*Statutes.*—It is the duty of the courts and inferior administrative and judicial bodies to enforce the valid laws enacted by the legislature, regardless of whether the wisdom of such laws accords with the views of such courts and bodies. p. 201.

10. CONSTITUTIONAL LAW.—*Intoxicating Liquors.*—*Sales.*—*Statutes.*—The liquor license act of 1875 (Acts 1875, [s. s.] p. 55) is constitutional. p. 204.

11. EVIDENCE.—*License.*—*Nuisance.*—In a prosecution against a saloon-keeper for maintaining a nuisance, the license issued to him is competent evidence of his right to conduct his saloon. p. 204.

From Hamilton Circuit Court; *Reed Holloman*, Special Judge.

Prosecution by the State of Indiana against Edward Sopher. From a judgment of conviction, defendant appeals. *Reversed.*

*Shirts & Fertig* and *Woollen & Woollen*, for appellant.

*James Bingham*, Attorney-General, *Doan & Orbison*, *H. M. Dowling*, *E. M. White*, *A. G. Cavins* and *C. M. Gentry*, for the State.

JORDAN, J.—The State commenced this action on March 9, 1907, upon an affidavit charging appellant with the commission of an alleged public nuisance. A motion to quash

the affidavit, on the ground that it did not charge a public offense, was overruled. Appellant pleaded not guilty. Trial by the court, which resulted in finding the accused guilty, and assessing a fine of $10. A motion for new trial, assigning as reasons therefor that the finding of the trial court was not sustained by sufficient evidence and was contrary to law, and that the court erred in not allowing appellant to introduce in evidence a license granted to him to sell intoxicating liquors, was denied, and a judgment was rendered against him upon the finding. He appeals to this court and assigns as error that the lower court erred, (1) in overruling his motion to quash the affidavit; (2) in denying his motion for a new trial. The affidavit upon which he was convicted, omitting the formal parts, is as follows: "James M. Lambert, being first duly sworn, upon his oath says that, as he is informed and verily believes, on March 9, 1907, at said county and State, Edward Sopher did then and there conduct and maintain a place where spirituous, vinous, malt, and intoxicating liquors were sold at retail, and a place where such spirituous, vinous, malt, and intoxicating liquors so sold at retail were drunk on the premises where sold; that the place where said Edward Sopher sold said spirituous, vinous, malt, and intoxicating liquors at retail, to be drunk on the premises where sold, is located in and on the only front ground-floor room of the only two-story brick building situated on part of lot six in square eight in the original town now city of Noblesville, in Hamilton county, Indiana [the premises being described in the affidavit by metes and bounds], said room fronting on Logan street at the corner of Eighth street and the public square in said city of Noblesville, Hamilton county, Indiana; that said place above described where said spirituous, vinous, malt, and intoxicating liquors were sold on March 9, 1907, said liquors to be drunk on the premises where sold, is a public nuisance and is to the injury of the citizens of Hamilton county, Indiana; that said Edward Sopher will continue to

use said premises for the sale by retail of spirituous, vinous, malt, and intoxicating liquors, and will continue to permit the same to be drunk on the premises where sold, unless said nuisance is abated and said Edward Sopher is restrained from so doing—all of which is contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Indiana."

But one witness on the trial was introduced upon the part of the State, and he testified that on March 9, 1907, appellant maintained and conducted a saloon in the city of Noblesville, Hamilton county, Indiana; that on said date he sold in his said saloon intoxicating liquors to various customers to be drank as a beverage on the premises where sold; that the saloon in question was situated and fronted upon Logan street, a public street in said city of Noblesville, on the northwest corner of the public square. This was all of the evidence given in the cause.

Appellant in his own behalf endeavored to show that on the day upon which he sold the intoxicating liquors, and maintained and conducted his saloon, as charged, he had and held a license, duly granted to him by the board of commissioners of said Hamilton county, under the laws of Indiana, authorizing him to sell at retail intoxicating liquors in the saloon in controversy, to be drank upon the premises where sold. The State, through its attorneys, objected to the introduction of any evidence going to show that appellant, at the time charged in the affidavit, had or held the aforesaid license, upon the ground that such license was no defense to this prosecution. The court sustained this objection and excluded the evidence, and would not permit appellant to prove that he held such a license. In fact, this prosecution may be said to proceed upon the theory that the sale alone of intoxicating liquors at retail, in a room or place kept for that purpose, such liquors to be drank as a beverage on the premises where sold, constitutes a public nuisance *per se* under and within the contemplation of section 534 of an act

of the legislature concerning public offenses, approved March 10, 1905 (Acts 1905, pp. 584, 709, §2179 Burns 1905). That this is the theory of counsel for the State is by the latter conceded. The section in question reads: "Every person who shall erect, or continue and maintain any public nuisance, to the injury of any part of the citizens of this State, shall, on conviction, be fined not exceeding $100." This provision has formed a part of the criminal law of this State for over sixty years. It will be found incorporated in the revised statutes of 1843 (R. S. 1843, p. 974, §65), constitutes section eight of the revised statutes of 1852 (2 R. S. 1852, p. 424), is embraced in the revised statutes of 1881 (§2065 R. S. 1881), and was reënacted by the legislature in 1905 (Acts 1905, *supra*).

In *Burk* v. *State* (1867), 27 Ind. 430, in construing this statute, the court said: "It defines—*i. e.* marks out with distinctiveness a public nuisance." While it is true that this statute expressly and distinctively declares it to be a public offense "to keep or continue and maintain a public nuisance," nevertheless it omits to define or declare what particular acts on the part of the accused shall constitute a public nuisance, hence, as held by this court in *State* v. *Berdetta* (1880), 73 Ind. 185, in placing an interpretation upon this statute, we must look to the common law in order to discover whether the acts charged in the affidavit were regarded thereunder as constituting a public nuisance. In view of the fact that the law upon which this prosecution rests is a reënactment by the legislature of 1905 of the same statute as is interpreted in *State* v. *Berdetta, supra,* we may therefore presume, under a well-settled rule (*Cain* v. *Allen* [1907], 168 Ind. 8; *Kunkle* v. *Abell* [1906], 166 Ind. 434, and authorities cited), that the legislature, in reënacting it, intended that it should be given the interpretation accorded to it in *State* v. *Berdetta, supra,* and that, in a prosecution for a violation thereof, the court should

look to the common law to ascertain whether the acts charged constituted a public nuisance.

The common law, together with acts passed by the British parliament in aid thereof, prior to the fourth year of the reign of James I is, by adoption, in force, and pre-

2.  vails in this State so far as applicable, and when not inconsistent with our fundamental laws, state or federal, and not inconsistent with the acts of our own legislature or statutes enacted by congress. §236 Burns 1901, §236 R. S. 1881; *Dawson* v. *Coffman* (1867), 28 Ind. 220; *LaFayette, etc., R. Co.* v. *Shriner* (1855), 6 Ind. 141; *Stevenson* v. *Cloud* (1839), 5 Blackf. 92; *Short* v. *Stotts* (1877), 58 Ind. 29; *Latta* v. *Miller* (1887), 109 Ind. 302; *Ledgerwood* v. *State* (1893), 134 Ind. 81.

By a positive or express declaration of the legislature, all public offenses, both felonies and misdemeanors, must be defined, and "punishment therefor fixed by statutes

3.  of this State and not otherwise." §237 Burns 1901, §237 R. S. 1881. This statutory provision has stood unrepealed as a governing rule or prescribed policy of the State since its enactment in the revision of our laws in 1852 to the present time, and operates as an exception engrafted upon the act adopting the common law, consequently no common-law crimes, punishable as such, exist in this State, but all public offenses must be defined by the legislature until §237, *supra*, is repealed. *Ledgerwood* v. *State, supra.*

It will be observed that there is no charge in the affidavit in this case to show that the sale of the liquors in question by appellant was unlawful, or that the room wherein they were sold and drank was kept in a disorderly manner, or that such room was in any manner conducted and maintained in violation of law.

If it is true, as argued by counsel for the State, that the acts charged in the affidavit constitute a public nuisance *per*

*se,* then it must be because such acts are unlawful.

4. Nuisances are classified as public and private. A public nuisance, strictly speaking, arises out of the violation of public rights, and, as a general rule, results in no more special injury to one person than to another. 1 Wood, Nuisances (3d ed.), §1.

Such a nuisance always arises from unlawful acts, consequently that which is lawful cannot be regarded in a legal sense as a public nuisance. Therefore, if the legisla-

5. ture of the State, by a statute, authorizes an act to be done, which, in the absence of such a statute, would constitute a public nuisance, such act is thereby made lawful, and cannot be considered or regarded in a legal sense as a nuisance so far as the public is concerned, unless the legislature, in enacting the statute, has exceeded its power. *Leigh* v. *Westervelt* (1853), 2 Duer 618; *Williams* v. *New York Cent. R. Co.* (1854), 18 Barb. 222; *Neaderhouser* v. *State* (1867), 28 Ind. 257; 21 Am. and Eng. Ency. Law (2d ed.), 684, 685.

Counsel for the State, in their attempt to answer the argument advanced by appellant's counsel, contend that the acts

6. charged against appellant were unlawful at common law, and that such a place as he is charged to have kept and maintained was a nuisance at common law equally with and in the same class as brothels, gaming-houses, etc. They, however, fail to cite us to any authority which can be said to support their contention. In fact, we have been unable to find any to justify their argument in this respect. It is true that brothels and gaming-houses were at common law, under all circumstances, held to be nuisances, but ale-houses and other places in which intoxicating liquors were sold to be drank as a beverage were not so held or regarded, unless they became disorderly, and in such cases it was not the mere sale of the liquors which constituted them nuisances, but it was the disorderly conduct therein, or, in other words, the disorderly manner in which they were

conducted, and in such cases it was immaterial whether the keepers thereof were licensed or unlicensed dealers.

The first general statute restricting and regulating the keeping of ale-houses and tippling-houses was passed by the British parliament in 1552 (5 & 6 Edw. VI, c. 25). The preamble to this statute declares: "For as much as intolerable hurts and troubles to the commonwealth of this realm doth daily grow and increase through such abuses and disorders as are had and used in common ale-houses and other houses called tippling-houses; (2) It is therefore enacted by the King, our sovereign lord," etc. At common law, prior to the passage of this statute, any person had the right, without a license, to maintain ale-houses and tippling-houses. Such business was not regarded as a public offense, but was held to be a means of livelihood which any one was free to follow. In support of this proposition see Stephens v. Watson (1702), 1 Salk. *45; King v. Randall (1695), 3 Salk. *27; Anonymous (1695), 3 Salk. *25; King v. Marriot (1693), 4 Mod. *144, and notes; Faulkner's Case (1670), 1 Saund, *249; King v. Ivyes (1687), 2 Showers (K. B.) *468; Commonwealth v. McDonough (1866), 13 Allen (Mass.) 581; Welsh v. State (1890), 126 Ind. 71, 9 L. R. A. 664; State v. Bertheol (1843), 6 Blackf. 474, 39 Am. Dec. 442; State v. Mullikin (1846), 8 Blackf. 260; 1 Hawkins, P. C. (8th ed.), 714; 4 Cooley's Blackstone (Andrews' ed.), *168; 1 Bishop, Crim. Law (8th ed.), §505; Bishop, Stat. Crimes (3d ed.), §§984, 985.

In the authority last cited it is said: "It is, at the common law, lawful to keep a properly-regulated inn, ale-house or tippling-house; which severally are indictable only when disorderly. Hence, a fortiori, the simple selling of intoxicating drinks is not a common-law crime, but * * * from an early period in English legislation, during anti-colonial times and thence downward to the present day with us, statutes, in various forms of provisions, have been enacted as aids to the suppression of enormous evils which

the use or abuse of inebriating liquors has wrought. Indeed, the old English enactments of this sort are numerous, and they have largely been the models for legislation in our states.''

In *Commonwealth* v. *McDonough, supra,* the defendant was charged with having kept a tenement-house in Boston, Massachusetts, from August 17, 1865, to October 17, of the same year, which house he used for the sale of intoxicating liquors therein, to the great injury and common nuisance of the citizens of the commonwealth, and contrary to the statutes. The prosecution was based upon a statute of that state which made it a penal offense for any person to keep or maintain a building used for the illegal keeping or sale of intoxicating liquors. Subsequently to the commencement of the prosecution in that case, but before the conviction of the accused, that part of the statute in respect to the penalty for a violation thereof was repealed by the legislature, and by reason of that fact it was held that the defendant could not be punished for the alleged offense. Counsel for the commonwealth, however, contended that the offense as set out and charged in the complaint was a nuisance at common law, and as common-law crimes still existed or were recognized in that commonwealth, hence the defendant might be punishable for the crime charged under the provisions of the common law. This contention the court denied, and in passing upon the question said: ''No authority is cited in favor of this position, and those which we have examined are opposed to it. In 1 Bishop, Crim. Law, §1047, it is said that, aside from statutory provisions, a crime is not committed by selling intoxicating liquors. Merchants have always dealt in wines and other liquors in large quantities, without being subject to prosecution at common law. * * * In the argument of the commonwealth, such places as the defendant is charged with keeping are classed with brothels and gaming-houses, and it is argued that they are all equally nuisances. But it was not

so at common law. Brothels and gaming-houses were held
to be nuisances under all circumstances; but ale-houses were
not, unless they became disorderly; and in such cases they
were held to be nuisances on account of the disorderly con-
duct.''

In passing it may be said that if tippling-houses, wherein
intoxicating liquors were sold to various persons to be drank
as a beverage, were already unlawful under the common law,
it would seem strange that the English parliament should
have interposed, and enacted a statute making such houses
unlawful and subjecting the business to certain restrictions
and regulations. As the authorities show, neither the sale
of intoxicating liquors nor the keeping and maintaining in
an orderly manner of tippling-houses, or other houses where-
in such liquors were sold to be used as a beverage, consti-
tuted a public offense or a public nuisance at common law.

Counsel for the State further contend that the trial court
properly held that a license granted to appellant by the
Board of Commissioners of the county of Hamilton
afforded no authority for the sale of such liquors,
because, as they insist, the act of 1875, under which
such license was issued, is unconstitutional, and therefore
invalid, for the reason that the traffic in intoxicating liquors
is dangerous and hurtful to society, and therefore wrong,
and the licensing thereof cannot be upheld under the Con-
stitution. This statute was approved March 17, 1875 (Acts
1875 [s.s.], p. 55), and is entitled ''an act to regulate and
license the sale of spirituous, vinous, malt and other intoxi-
cating liquors.'' The first section, as amended in 1897
(Acts 1897, p. 253, §7276 Burns 1901), declares: ''It shall
be unlawful for any person, directly or indirectly, to sell,
barter or give away for any purpose of gain, any spirituous,
vinous, or malt liquors without first procuring from the
board of commissioners of the county in which such liquor
is to be sold, a license as hereinafter provided; nor shall
any person, without having first procured such license, sell

or barter any intoxicating liquor to be drunk, or suffered to be drunk, in his house, outhouse, yard, garden, or the appurtenances thereto belonging."

Section twelve of the statute as originally enacted (Acts 1875, *supra*) provided that the penalty for selling in violation of the provisions of the act should be a fine of not less than $20 nor more than $100, to which the court or jury trying the cause might add imprisonment in jail of not less than thirty days nor more than six months. As amended by the legislature of 1907 (Acts 1907, pp. 27, 28) this section now provides: "That any person not being licensed under the laws of the State of Indiana who shall sell or barter, directly or indirectly, any spirituous, vinous or malt liquors in a less quantity than five gallons at a time, or who shall sell or barter, directly or indirectly, any spirituous, vinous or malt liquors to be drunk, or suffered to be drunk in his house, outhouse, yard, garden, or appurtenances thereto belonging, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than $50 nor more than $100 for the first offense, and not less than $100, nor more than $500, to which the court or jury trying the case shall add imprisonment in the county jail of not less than thirty days nor more than six months for the second or any subsequent offense. And any person who shall keep, run or operate a place where intoxicating liquors are sold, bartered or given away in violation of the laws of the State, or any person who shall be found in possession of such liquors for such purpose shall be deemed guilty of a misdemeanor and upon conviction shall be fined in any sum not less than $50 nor more than $500, to which the court or jury trying the case shall add imprisonment in the county jail of not less than thirty days nor more than six months."

Counsel for the State repeatedly assert that the right to engage in the retail of intoxicating liquors is not an inherent or inalienable right. Therefore they argue that, if the right

to traffic in intoxicating liquors exists in this State, it must arise out of some valid legislative grant, and that a statute granting such right is violative of the general import or spirit of the state Constitution, and therefore must be held invalid. They assert that the object of the liquor license law of this State is to restrict a supposed common-law right, but they affirm that no such right existed under the common law, and therefore there is no cause for the passage of such laws by the legislature. The dicta of the higher courts, both state and federal, are quoted to show that the traffic in intoxicating liquors results in much evil, vice and crime, etc., and from these dicta of the courts counsel insist that the business of conducting a place wherein intoxicating liquors are sold is wrongful, or, in other words, a public nuisance *per se,* and should be so declared by the court. They further argue that, if the saloon business is dangerous and hurtful to the public, it must be deemed and held to be a common nuisance, and if the act of 1875, *supra,* creates the right of the liquor dealer to engage in the business of retailing intoxicating liquors, to be drank as a beverage on the premises where sold, such act operates to license a wrong of the nature of a public nuisance, and therefore should be held to be unconstitutional by the court, and the license granted thereunder to appellant in this case is no protection to him in maintaining a nuisance.

Counsel, however, appear to be unmindful of the fact that it is the unrestricted and unregulated traffic in such liquors which the courts have regarded as tending to pernicious results. For example, in *State* v. *Gerhardt* (1896), 145 Ind. 439, 477, 33 L. R. A. 313, in considering the validity of the statute commonly known as the Nicholson law, which was an act better to regulate and restrict the sale of intoxicating liquors, the Supreme Court, in the course of its opinion, said: "The unrestricted traffic in intoxicating liquors has been found, by sad experience, to be fraught with great evil, and to result in the most demoralizing influence upon pri-

vate morals, and the peace and safety of the public.'' See, also, Black, Intox. Liquors, §31; *Schwuchow* v. *City of Chicago* (1873), 68 Ill. 444.

Such being the tendency of the traffic, the British parliament, several centuries ago, as we have heretofore shown, and the legislature of this State, as well as the legislatures of sister states, following the example of our ancestors, have deemed it essential that the business should be permitted to exist only under such restrictions and regulations as, in their judgment, would serve to secure society or the public against the dangers and evils of the traffic, or, in other words, operate to mitigate, or minimize as much as possible, such dangers and evils. This has been the legislative policy adopted and pursued from the very beginning of our territorial existence down to the present time. Should we now deny the power of the legislature, under our Constitution, to permit the traffic in intoxicating liquors to exist under such restrictions and regulations as that body may consider fit and proper to impose, we would have no constitutional warrant for so holding. Such a decision would be nothing more than the exercise of the mere arbitrary will of the judges composing this tribunal. It would be a nullification by the judiciary of a long and well-settled legislative policy. If such a revolution is desired, it must be inaugurated, not by the courts, but by the people, through their representatives in the General Assembly. The legislative and judicial departments of our state government, under the Constitution, are separate and distinct from each other. Each is forbidden by our fundamental law to exercise the functions of the other. Therefore, the courts cannot make laws or regulations pertaining to the health, morals or safety of the public. The making of these laws, the same as others, is a question to be dealt with by the legislative department and not by the courts. Neither is a court authorized to adjudge a thing to be a public nuisance which is not regarded as such by law.

We note some of the laws enacted at an early period to restrict, license and regulate the sale of intoxicating liquors. In 1807 a territorial law was approved by Governor William Henry Harrison, the purpose of which was to license and regulate taverns, ale-houses and dram-shops. The first section of this act declares: "For preventing disorders, and the mischiefs that may happen by multiplicity of public houses of entertainment, no person or persons shall in future have or keep any * * * public house of entertainment in any county, town or place within this territory, unless such person or persons shall first obtain permission or license from the court of common pleas, which shall continue for one year and no longer under the penalty of $1 per day," etc. Laws Indiana Territory, 1807, p. 87. This act contained ten sections, and thereby regulations for the keeping of such houses and the traffic of liquors therein were fully provided for. After the admission of Indiana as a State we find that by an act approved January 24, 1828 (Acts 1828, p. 79), the courts doing county business were "authorized to license, as retailers of spirituous or strong liquors, * * * any person or persons who may apply therefor, for a term not less than one year," etc. To secure a license under this act the applicant was required to produce a certificate, signed by twelve respectable freeholders, stating that he was of good moral character, and he was required to pay the license fee fixed by the court. No such license, however, could be granted if the majority of the freeholders of the city or town remonstrated against the granting thereof. Other laws, both general and special, were enacted by the legislature under the Constitution of 1816 down to the adoption of our present Constitution in 1851. These are all cited in the brief of appellant's counsel, but to mention them in detail would only serve to extend this opinion. Those which are general are, in the main, referred to and considered by this court in *Harrison* v. *Lockhart* (1865), 25 Ind. 112. This restrictive and regulating

policy adopted by the legislature, relative to the traffic in
intoxicating liquors, was continued down to the adoption of
the Constitution of 1851. On October 12, 1850, at the very
threshold of the convening of the convention which formu-
lated our present Constitution, a resolution was submitted
to that body to the effect that a provision be incorporated
in the Constitution "to restrict the Indiana legislature from
granting a license to vend spirituous liquors in the State."
Various petitions were also submitted to the convention,
requesting that the traffic in such liquors be prohibited by
the Constitution. Subsequently, on November 9, 1850, an-
other resolution was introduced, providing that a provision
be incorporated in the Constitution prohibiting the General
Assembly from passing or continuing in force any law
authorizing the granting of any license for the sale of in-
toxicating liquors. These resolutions appear to have been
referred to the committee on the legislative department.
On December 19, 1850, this committee, through its chair-
man, reported to the convention as follows: "The com-
mittee on the legislative department, to whom was referred
sundry petitions and resolutions on the subject of the sale
of ardent spirits, have had that subject under consideration,
and have directed me to report that your committee deem it
inexpedient to make any constitutional provision on that
subject, as it more properly belongs to the legislature. They
therefore ask to be discharged." This report was concurred
in by the convention. Mr. Bryant, in behalf of a select
committee which had a petition upon the subject under con-
sideration, also reported to the convention as follows: "The
select committee, to whom was referred the petition of 118
ladies, praying that the legislature may be prohibited from
passing any law authorizing licenses for the sale of intoxi-
cating liquors, have had the same under consideration, and
a majority of said committee have instructed me to report
the following section to be inserted in the new Constitution,
and to ask that they may be discharged. * * * Sec-

tion —.  The General Assembly shall not pass any act authorizing the grant of license for the sale of intoxicating liquors.''  This report was not concurred in, but, on motion, was laid upon the table.  Subsequently, on December 23, a motion was made to take the last-mentioned report from the table, but this motion did not prevail, there being thirty-six ayes and seventy-two noes.  Again, on December 28, a resolution was submitted that the chair appoint a committee to prepare and report a section for the new Constitution prohibiting the General Assembly from passing or continuing in force any law authorizing the granting of a license for the sale of ardent spirits or intoxicating liquors.  Later on a motion to lay this resolution on the table prevailed by a vote of seventy-eight to forty-four.  For these various proceedings of the Constitutional Convention of 1850-51 see Convention Journal, pp. 48, 154, 164, 193, 259, 276, 477, 478, 555, 603, 604.

By these deliberative acts of the convention which formed and moulded our present Constitution that body appears to have left the question in regard to the traffic in intoxicating liquors in the hands of the legislative department, where the convention found it at the time it convened.  Its action, therefore, in the matter fully serves to contradict or break down the contention of counsel for the State, that the legislature, in continuing its former policy to restrict and regulate the sale of intoxicating liquors, by passing the act of 1875, *supra,* violated the general import and spirit of our present Constitution.  Since the adoption of the latter, and prior and subsequently to the passage of the act of 1875, *supra,* the legislature has enacted other laws regulating the sale of intoxicating liquors, by imposing restrictions and conditions upon the traffic.  The validity of these laws, and of municipal ordinances of similar import and effect, has been repeatedly sustained by this court, and the question of the constitutional validity of such laws as the act of 1875, *supra,* is no longer an open one in this jurisdiction.

See *Thomasson* v. *State* (1860), 15 Ind. 449; *Harrison* v. *Lockhart* (1865), 25 Ind. 112; *Wiley* v. *Owens* (1872), 39 Ind. 429; *O'Dea* v. *State* (1877), 57 Ind. 31; *Walter* v. *Town of Columbia City* (1878), 61 Ind. 24; *McKinney* v. *Town of Salem* (1881), 77 Ind. 213; *Hedderich* v. *State* (1885), 101 Ind. 564; *Vinson* v. *Town of Monticello* (1889), 118 Ind. 103; *Emerich* v. *City of Indianapolis* (1889), 118 Ind. 279; *Bush* v. *City of Indianapolis* (1889), 120 Ind. 476; *Moore* v. *City of Indianapolis* (1889), 120 Ind. 483; *Decker* v. *Sargeant* (1890), 125 Ind. 404; *Welsh* v. *State* (1890), 126 Ind. 71, 9 L. R. A. 664; *City of Indianapolis* v. *Bieler* (1894), 138 Ind. 30; *State* v. *Gerhardt* (1896), 145 Ind. 439, 33 L. R. A. 313; *Flynn* v. *Taylor* (1896), 145 Ind. 533; *Daniels* v. *State* (1898), 150 Ind. 348; *Boomershine* v. *Uline* (1902), 159 Ind. 500; *Jordan* v. *City of Evansville* (1904), 163 Ind. 512, 67 L. R. A. 613; *Schmidt* v. *City of Indianapolis* (1907), 168 Ind. 631; *City of Greencastle* v. *Thompson* (1907), 168 Ind. 493.

Other decisions of the higher courts, both state and federal, might be cited to show that the State has plenary authority under the police power to permit the traffic in intoxicating liquors to exist within its borders under such restrictions and regulations as may be imposed, in the absence of any constitutional provision to the contrary. We cite the following federal decisions: *Thurlow* v. *Commonwealth* (1847), 5 How. (U. S.) 504, 12 L. Ed. 256; *Pervear* v. *Commonwealth* (1866), 5 Wall. (U. S.) 475, 18 L. Ed. 608; *Crowley* v. *Christensen* (1890), 137 U. S. 86, 11 Sup. Ct. 13, 34 L. Ed. 620; *In re Heff* (1905), 197 U. S. 488-505, 25 Sup. Ct. 506, 49 L. Ed. 848; *Pabst Brewing Co.* v. *Crenshaw* (1905), 198 U. S. 17, 25 Sup. Ct. 552, 49 L. Ed. 925; *Vance* v. *W. A. Vandercook Co.* (1898), 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100; *Cronin* v. *Adams* (1904), 192 U. S. 108, 24 Sup. Ct. 219, 48 L. Ed. 365. See, also, Black, Intox. Liquors, §115.

As previously shown, counsel for the State rely upon ev-

pressions of the courts in such cases as *Crowley* v. *Christensen, supra, Cronin* v. *Adams, supra,* and *State* v. *Gerhardt, supra,* wherein it is said that there is no inherent or inalienable right in any citizen to carry on the business of selling intoxicating liquors at retail. They argue that these expressions by the higher courts justify their position that the legislature of this State had no power to enact the license law of 1875 (Acts 1875 [s.s.], p. 55), whereby the business of retailing intoxicants is subjected to restrictions and regulations. It may be said, however, that by the expressions in question, as employed by the courts, the latter intended to show that, by reason of the fact that the unrestricted retail of intoxicating liquors, to be used as a beverage, was pernicious in its effects and hurtful or injurious to society, therefore the right to pursue such vocation was not of such an inherent or inalienable nature as to place the business beyond the control of the legislative department. The latter might, in the exercise of its discretion, under the police power, in the interest of society and the public in general, either suppress or prohibit the traffic entirely, or permit it to exist under such necessary restrictions, regulations and burdens as might be deemed proper to impose in order to mitigate or minimize the evils resulting from the traffic, and as against the validity of such laws enacted by the legislature, the liquor dealer was not in a position to assert any inherent or inalienable right to the contrary.

It is manifest that counsel for the State are mistaken in their view when they assert that the act of 1875, *supra,* serves to license or authorize a wrong, or, in other words, a public nuisance; that, in the absence of this statute, the saloon or dram-shop would be illegitimate, and, under the common law, could have no legal standing or existence; that the right or privilege to conduct such a place is, as they assert, due to, or the offspring of, the statute and is not awarded by the common law. The contrary, however,

is fully shown by the authorities herein cited. In fact, it would seem that no one who has regard for the force of language can argue with any plausibility that the act of 1875, *supra,* grants any right to the retailer of intoxicating liquors which he would not possess if it had not been enacted. On the contrary, that law, and others in aid thereof or supplemental thereto, deprive the retailer of liquors of many of his common-law rights and privileges, and permit him only to conduct his business under the many restrictions and regulations thereby prescribed. In fact, the statute, instead of granting the right or privilege to sell liquors, is a qualified prohibition of such right or privilege. By this statute the sale of intoxicating liquors, as permitted by the common law, is first prohibited or declared to be unlawful in order to compel the person who desires to sell such liquors to be drank on the premises to secure a license for that purpose, subject to the special tax prescribed and to the other restrictions and regulations therein imposed. Black, Intox. Liquors, §117.

It will be observed that the first section of the act in question declares that ''it shall be unlawful for any person, directly or indirectly, to sell, barter or give away, for any purpose of gain, any spirituous, vinous or malt liquors, without first procuring from the board of commissioners of the county   *   *   *   a license as hereinafter provided.'' It may be said that it seems singular that the legislature, in enacting the statute, should deem it necessary to declare that to be unlawful which, as counsel for the State contend, was already unlawful at common law. The statute neither professes to, nor does it, license a business that was wrong or illegitimate at common law, but it was enacted as a qualified prohibition or restriction upon the traffic, and certainly was not passed in the interest of the liquor dealer, but for the protection of society and the community in which the business is conducted. Under the provisions of laws supplemental thereto and in aid of the act of 1875, *supra,* a system

of local option is provided, whereby a majority of the legal
voters of a township or city ward can, in their discretion,
under a remonstrance, bring about absolute prohibition of
the traffic within their localities for at least two years, or,
in other words, as long as they see proper to remonstrate.
That this statute has been regarded by this court as pro-
hibitory or restrictive of the common-law right to traffic in
intoxicating liquors is fully disclosed by the opinions of the
court given from time to time. In *Welsh* v. *State, supra,*
the court said: ''It is undoubtedly true that the common
law does not recognize any difference between intoxicating
liquors as property and any other species of property.    But
while it is true that intoxicating liquor is property, still its
inherent character is such that it is the proper subject of the
police power.   [Citing authorities.]   Were it not for statu-
tory restrictions and prohibitions every person would be as
free to engage in the business of manufacturing and selling
intoxicating liquor as he would be to engage in the manufac-
ture and sale of any other property.   It is not true, as is
sometimes argued, that the citizen derives his right to sell in-
toxicating liquor from the particular state in which he sells.
In selling he is but exercising his common-law right.   All
laws regulating and imposing burdens on the business are
prohibitory in their character.   There is no difference be-
tween an absolute prohibitory law, a law providing for local
option, and a license law, except in the extent to which they
prohibit.   *   *   *   An absolute prohibitory law deprives
all within its reach from engaging in the business; a local
option law prohibits all within a given locality from selling
within that locality; while a license law prohibits all within
the State, who have not obtained a license, from engaging in
the business of retailing intoxicating liquors.   Each of these
is a restriction upon the common-law right of the individual
citizen.   The first wholly deprives him of the right, while
the other two prohibit him to a limited extent.''
 In *Emerich* v. *City of Indianapolis, supra,* this court said:

''Liquor sellers are subjected to the payment of a special tax, because the object of this class of legislation is to restrict the business. * * * The liquor seller is compelled to pay a special tax, in the form of a license fee, in order that the business may be restricted to fewer persons, and not be open, like other pursuits, to every one without the payment of any special tax. The theory of the legislation upon this subject is, that the business is one which requires restraint because it is harmful to society, and a license fee is exacted for the purpose of restricting the business, and not for the purpose of increasing the traffic. * * * The law in exacting a license fee does not grant a privilege that did not before exist, but, on the contrary, lays a special tax upon a pursuit which, but for the statute, might be followed without paying any special tax.''

The infirmity of the argument presented by counsel for the State is that therein they assume that to be true which is not, viz., that the statute in controversy grants the right to sell at retail intoxicating liquors, which right or privilege so granted is in derogation of the common law. Upon this unfounded or empty assumption they base their argument. We may repeat what we have herein fully shown under the authorities cited, that, from the very beginning of the common law (in force in this State by adoption) on down to the present time, the traffic in intoxicating liquors at retail or otherwise was, under that law, regarded as lawful, unless declared to be unlawful by a positive act of the legislative department. Reducing counsel's argument to a simple proposition, it may be said to be more in the nature of a quarrel with the legislature, because that body did not enact the law in dispute more fully and completely along the lines of absolute prohibition, than it is a legal argument. With the wisdom or policy of such laws as the act of 1875, *supra*, we, as a court, have no concern. The judgment of the legislature in respect to the expediency or wisdom of laws enacted by it is not a matter subject to judicial review. In passing,

it may be said that counsel for the State in this appeal cannot be credited with having first invented the unique and novel doctrine, viz., that the method provided by the legislature under the act of 1875, for restricting and regulating the traffic in intoxicating liquors, is violative of the spirit of the state Constitution, for the identical question was presented by counsel for appellant, and considered by this court, in the appeal of *Haggart* v. *Stehlin* (1892), 29 N. E. 1073. That was a civil action to recover special damages resulting from the proximity of the defendant's saloon to the plaintiff's residence.   At the first hearing of that cause the opinion of the court was prepared by Elliott, C. J.   Subsequently a rehearing was granted, not upon the question relative to the invalidity of the statute of 1875, but upon another feature of the case.   At the second hearing of the cause (*Haggart* v. *Stehlin* [1894], 137 Ind. 43, 22 L. R. A. 577) the opinion was written by McCabe, J., who had succeeded Elliott, J., as a member of this court.   In the course of the opinion prepared by him, Elliott, C. J., said: ''One question, and only one, is here presented.   *   *   * That question is this:  Is the statute of March 17, 1875, regulating the liquor traffic, requiring a license and imposing a tax upon dealers in the form of a license fee unconstitutional?   The assault upon the statute comes from a quarter different from that whence all assaults have come in the past, for it comes from citizens and property owners who are not engaged in the traffic; not from those whom the law requires to take out a license, and against whom penalties are denounced for a failure to pay the fee prescribed and to obtain the license which is required of all who engaged in the business of dram selling.   The position of the appellants is a novel one;  there is no instance in the books where such a position has been assumed.   We are asked to overthrow a principle of law which has prevailed, not merely for years, but for centuries.   So far as we can ascertain, the power of the legislative department to regulate the liquor traffic by

exacting a license has never been challenged by parties other than those of whom a license was exacted until now. In every reported case the power has been asserted to exist. The state courts have, without a break in the current of opinion, affirmed the validity of such statutes, but no court has asserted their validity in stronger or more emphatic terms than the Supreme Court of the United States. There is absolutely no diversity of opinion; there is, therefore, no room for doubt, no question as to our duty, for we are bound by the law as it exists. We are not lawmakers, and hence are without power to change the law. A change can be made only by the lawmaking department of the government. The question is so free from difficulty, and so firmly settled, that there is really no room for discussion.''

In the opinion of the court prepared by McCabe, J., it is said: ''Much labor and learning is expended by appellants' counsel in a contention that the license alleged in Stehlin's answer was invalid because the act approved March 17, 1875, requiring such a license to be taken out as a condition to sell intoxicants by the drink is unconstitutional. Why appellants' counsel so contend is a mystery to this court. If such contention were upheld, it is difficult to see how it could help the appellants. They are asking damages for, and an injunction against, an alleged nuisance created by the sale of intoxicants by the drink, in close contact with their dwelling-house. But for the liquor license law, every man in the ward, every man, woman and child in the city could, if they chose, engage in the traffic without giving bond to keep an orderly house, without establishing their fitness to be entrusted with the sale of intoxicants, and without any other of the many restrictions and burdens that that statute imposes upon the traffic. With that statute obliterated, the appellees could stand up and say, our business stands on the same legal basis as that of the dry-goods merchant, the groceryman, the hardware merchant, or any other legitimate business or traffic. There is no mark of the public ban upon

it, and our business stands the equal before the law of all other branches of traffic, and, therefore, we can no more be subjected to the charge of being the maintainers of a nuisance than the dry-goods merchant. On the other hand, the license law treats the traffic as dangerous, as dangerous to public and private morals, dangerous to public peace and the good order of society, and, therefore, imposes heavy burdens upon it, among which is a heavy license fee to the county and city, and throws around it severe restrictions and liabilities upon those who engage in it, and of whom it requires proof of their fitness to be entrusted with the sale of the dangerous thing. With such a law in force, and springing as it does from such a public policy, as old as the state government, it is and must be easier to reach the conclusion that a licensed saloon might be kept in such a place as to make it a nuisance *per se,* than if the law and the policy upon which it is founded were obliterated, as appellants' counsel would have us do. So it seems quite apparent to us, if appellants' contention that the license law is unconstitutional should prevail, it would weaken rather than strengthen their position. Such laws have been in existence from the earliest times, and the courts everywhere have upheld their constitutionality, and appellants' counsel have been unable to cite a single decision where such laws have been held unconstitutional. * * * Counsel suppose the law was enacted for the protection of those engaged in the traffic, and to encourage and foster that traffic, and cite provisions of the Constitution supposed to be inimical to such an object and policy, whereas the object was to protect the people, and society generally, against the known evils and dangers which had arisen from the free and unlimited right of all people and all kinds of people to engage in the sale of intoxicating liquors, which they would enjoy without any statute upon the subject. * * * The question is not whether the statute provides the most effective remedy for the evils mentioned nor whether some other kind of statute

would not have better accomplished the object in view. That consideration belonged exclusively to the legislature. The argument of appellants' counsel, all the way through, is precisely such argument as might be appropriate to address to the voters before an election whereat a legislature is to be elected.''

While the overthrow of the act of 1875, *supra,* and the laws supplemental thereto, such as the Nicholson law (Acts 1895, p. 248, §7283a *et seq.* Burns 1901), and the Moore law (Acts 1905, p. 7, §7283i Burns 1905), upon the untenable doctrine advanced by the State would no doubt be very gratifying to the latter and to those who concur in their peculiar views, nevertheless it is manifest that such a result would not conduce to the interest or furtherance of the cause of temperance, for, as affirmed in *Haggart* v. *Stehlin* (1894), 137 Ind. 43, 22 L. R. A. 577, it would operate to restore all persons to their unrestricted rights under the common law to retail intoxicating liquors, and all who desire to engage in the traffic could do so without regard to their fitness, or, in other words, absolutely unrestricted, save and except as they might be prohibited by some statute relating to sales to minors, habitual drunkards, persons in a state of intoxication, or on certain days or at times upon which the sale of liquor is forbidden, and, under the circumstances, dram-shops or saloons would be multiplied in every hamlet and village throughout the State.

It is not within the province of the judges of this court, nor of those of the lower courts, in the discharge of their official duties, to criticize the policy of the legislative department, which the latter has adopted in dealing with the liquor traffic. In the administration of justice all courts must be controlled, so far as applicable, by the laws which the legislature has constitutionally enacted, without regard to the individual views, in respect to the wisdom or expediency of such laws, of the persons who may preside over such courts. Neither boards of commissioners nor

courts can be held responsible for granting a license under the laws to sell intoxicating liquors to an applicant therefor who is shown to be legally entitled to such license. In discharging this duty such boards of commissioners and courts but carry out the mandate of the law, above which no one can rise, and not the individual views of those who preside over them. It must be evident to every unprejudiced mind that a court cannot nullify an act of the legislature on the mere assertion of persons assailing it that a license granted thereunder permits the licensee to maintain a public nuisance *per se* by merely selling intoxicating liquors, without violating any of the laws of the State in conducting the place in which such liquors are sold, for, as heretofore shown, whatever is authorized by an act of the legislature, which that body is competent, under the Constitution, to pass, is not, in the eye of the law, a nuisance.

While all citizens of this State have a perfect right to cry out, or declare upon the hustings, or before the legislature, or other assembled bodies, that the liquor traffic cannot be legalized without committing a sin, and while their arguments might be sufficiently potent to induce the legislature to prohibit absolutely the traffic, they could be of no avail before a court which can neither make nor unmake laws.

It is true that there is a diversity of opinion among the people in respect to the manner in which the legislature should deal with the question in regard to intoxicating liquors. There are very many good people who declare that the absolute prohibition of the traffic is the only system which the State should adopt; while, on the other hand, very many others, equally as good, express views to the contrary, and assert that the qualified prohibitive system which has been adopted by the legislature is the better plan. With this mooted legislative question judges of courts, in their official relations, are not concerned. The only standard which they can recognize, to measure their duty in dealing with the question of granting a license in the cases before

them, is the one prescribed by law. Were courts, in the administration of justice, to depart from the well-settled rules or standards of the law, and instead thereof accept for their government in the premises some particular standard of morality or ethics advanced in contravention of acts of the legislature, then, under such circumstances, all legal rules might be abrogated, and there would be no stability in the administration of justice by our courts. In *Otis* v. *Parker* (1903), 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323, Holmes, J., speaking for the court, very appropriately says: "While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions." That people greatly differ in their opinions in respect to the use of liquors—spirituous, vinous or malt—must be conceded. Some advocate absolute abstinence, while others uphold the moderate or temperate use of such liquors, and seek to justify their contention by approving of the advice of Paul to Timothy: "Drink no longer water, but use a little wine for thy stomach's sake, and thine often infirmities." 1 Timothy, chap. 5, verse 23.

Counsel for the State, in concluding their argument, affirm that there can be no question of *stare decisis* in this case, because there are no property rights involved, but that the court must be controlled by the principle or maxim *fiat justitia, ruat coelum,* or, in other words, we are invoked to sustain the peculiar opinions or views of counsel by overruling all of our former decisions which uphold the right of the

legislature, under the Constitution, to restrict and regulate the common-law right of a person to retail intoxicating liquors, and to hold that the legislature, in the future, is powerless to restrict the sale of the same, unless it be under an absolute prohibitory law enacted by that body. If it could be said that the legislature, under our Constitution, in dealing with the traffic, must be confined to the passage of a prohibitory measure, then the eminent men who formulated our fundamental law, members of the legislature and courts, have been for many years quite ignorant or uninformed in respect to the power of the legislature in dealing with the question. Especially may this be said in regard to the legislature of 1881, which passed a joint resolution proposing to engraft a prohibitory amendment upon our present Constitution. Acts 1881, p. 720.

In conclusion, we hold that the act of 1875, *supra,* is not open, under the Constitution, to the objections urged against it by counsel for the appellee, and we, therefore, affirm its validity. We conclude that the affidavit in this case does not charge a public offense, and that the lower court erred (1) in overruling appellant's motion to quash; (2) in excluding as evidence the license granted to him by the Board of Commissioners of the County of Hamilton, under which he sold the liquors in question, and (3) in convicting him upon the evidence of the offense charged.

The judgment is reversed, and the cause remanded to the lower court, with instructions to grant appellant a new trial and to quash the affidavit.